AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Utah

In the Matter of the Search of

▮▮▮▮▮▮▮▮▮ (Vernon
▮▮▮▮▮▮▮▮▮▮▮▮▮ (Perkins Residence)
▮▮▮▮▮▮ (RentDue Office)
Person of Matthew Shane Perkins
Person of Jeffrey Jace Vernon
Google LLC, located at 1600 Amphitheatre Parkway,
Mountain View,
CA 94043

Case No.
4:25-mj-00107-PK
4:25-mj-00108-PK
4:25-mj-00109-PK
4:25-mj-00110-PK
4:25-mj-00111-PK
4:25-mj-00112-PK

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 to A-6

located in the _____ Districts of  Utah and Northern California , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments B-1 and B-2

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | | Offense Description |
|---|---|---|
| 18 U.S.C. 1343 | Wire Fraud | |
| 18 U.S.C. 1348 | Securities Fraud | |
| 18 U.S.C. 1957 | Money Laundering | |

The application is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**FBI SA Kenneth Smith**
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  31 OCTOBER 2025

_____
*Judge's signature*

City and state:  St. George, Utah

**U.S. Magistrate Judge Paul Kohler**
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEACH OF: | **SEALED** |
| ██████████████████ (Vernon Residence) | CASE NO. |
| ██████████████████ (Perkins Residence) | AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS |
| ██████████████ (RentDue Office) | 4:25 - mj - 00107 - PK<br>4:25 - mj - 00108 - PK<br>4:25 - mj - 00109 - PK |
| Person of Matthew Shane Perkins | 4:25 - mj - 00110 - PK<br>4:25 - mj - 00111 - PK |
| Person of Jeffrey Jace Vernon | 4:25 - mj - 0012 - PK |
| Google LLC, located at 1600 Amphitheatre Parkway, Mountain View, CA 94043 | |

## INTRODUCTION AND AGENT BACKGROUND

I, Kenneth Smith, being duly sworn hereby depose and say:

1. I make this affidavit in support of an application under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) for a warrant to search the following locations, persons, and Google accounts:

   a.   the premises located at ███████████████████ (the residence of Jeffrey Jace Vernon (**VERNON**) hereinafter referred to as **Vernon Residence**)

1

    b.   the premises located at ███████████████████ (the residence of Matthew Shane Perkins (**SHANE**) and Talease Perkins (**TALEASE**) hereinafter referred to as **Perkins Residence**);

    c.   the premises located at ████████████████ (the office of RentDue Capital (**RENTDUE**) hereinafter referred to as **RentDue Office**);

    d.   Person of Matthew Shane Perkins;

    e.   Person of Jeffrey Jace Vernon; and

    f.   Google LLC, located at 1600 Amphitheatre Parkway, Mountain View, CA 94043 (Jace Vernon's and RentDue's Google account, including email and Google Drive).

2.  These locations, persons, and Google accounts are described in Attachment A.  This warrant is sought to search for and seize the things described in Attachment B. As described in Attachment B, I seek this warrant to obtain authority to seize electronic devices that Vernon and Perkins use to perpetuate a fraud scheme. Based on my training and experience, laptops and cell phones are portable devices that individuals often transport between different locations. If, for example, an individual's laptop that he uses for work is not located at the individual's office, there is a fair probability that the laptop is on the individual's person or in the individual's home. The same goes for an individual's cell phone. For this reason, I seek authority to search RentDue's office for electronic devices that Vernon and Perkins use to conduct RentDue business, as well as authority to search Vernon's and Perkin's persons and residences for such devices.

3.  I am a Special Agent of the Federal Bureau of Investigation (FBI), and as such, I am "an investigative or law enforcement officer of the United States," within the meaning of 18 U.S.C. § 2510(7); that is, I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. I have been a

Special Agent with the FBI since March of 2008. I have attended classes and courses conducted by the FBI and other government agencies regarding the conduct of various criminal activities by persons and/or groups. As a Special Agent with the FBI I have been involved in numerous investigations, including drug trafficking, money laundering, various fraud schemes, illegal firearm possession, racketeering, violent crime in aid of racketeering, and kidnapping, among others.

4.    Through my employment with the FBI, I have gained knowledge in the use of various investigative techniques including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

5.    Based on the facts set forth in this affidavit, there is probable cause to believe that **SHANE** and **VERNON** have violated and continue to violate the following federal laws: 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1348 (securities fraud); 18 U.S.C. § 1957 (money laundering) (**TARGET OFFENSES**). Additionally, there is probable cause to believe that evidence, fruits, and instrumentalities of these unlawful activities are contained in the locations and on the persons described in Attachment A.

6.    All information in this affidavit is either personally known to me, has been related to me by other law enforcement officers, or has been related to me by records and documents gathered during the course of this investigation, as noted. Because the affidavit is submitted for the limited purpose of establishing probable cause in the application of a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

7.    The warrant seeks evidence, fruits and instrumentalities of criminal activities which have occurred and are believed to be continuing to occur, in violation of the above-listed offenses.

## APPLICABLE STATUTES

8.    The federal wire fraud statute, 18 U.S.C. § 1343, provides in pertinent part: "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

9.    The federal securities fraud statute, 18 U.S.C. § 1348, provides in pertinent part: "[w]hoever knowingly executes, or attempts to execute, a scheme or artifice... (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery… shall be fined under this title, or imprisoned not more than 25 years, or both."

10.    The federal money laundering statute, 18 U.S.C. § 1957, provides in pertinent part: "[w]hoever engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be fined under this title or imprisoned for not more than 10 years or both."

## SUMMARY

11. Your affiant has been assigned to investigate Matthew **SHANE** Perkins and Jeffrey Jace **VERNON**, and other individuals and entities in connection with their respective roles in a scheme to commit wire fraud, securities fraud, and money laundering through fraudulent representations of investment returns and falsification of financial information.

12. Investigators believe that SHANE and VERNON are conducting a Ponzi scheme by paying earlier investors with new investors' money and by making false representations about the investment. Ponzi schemes rely on a constant flow of new money to pay older investors, thus maintaining the illusion of significant returns and convincing investors to keep their money invested. The perpetrators of this scheme falsified investment brokerage account statements and created other false or misleading portrayals of investment returns, purporting large gains, while in fact suffering almost total losses of investments, in order to obtain additional money from new or previous investors.

## PROBABLE CAUSE

13. On July 21, 2025, Mountain America Credit Union (MACU) reported concerns that their customers TALEASE, SHANE, and VERNON were working together to operate unlicensed investment businesses FORGED OAK, LLC and RENTDUE CAPITAL, LLC. According to MACU, TALEASE and SHANE are the authorized signers of MACU business account ███████ also known as FORGED OAK LLC, which was opened on July 31, 2023. Both TALEASE and SHANE listed ███████████████████ as their home address. According to its the Certificate of Organization, FORGED OAK, LLC was formed in the state of Utah on July 11, 2023, by Registered Agent 720 Empire, LLC. The business address of both 720 Empire and FORGED OAK, LLC was listed as ██████████████████████ (Perkins Residence).

5

14. VERNON is the authorized signer of MACU business accounts ███████ for RENTDUE CAPITAL (opened April 25, 2024) and ███████ for RENTDUE CAPITAL FUND 3 (opened June 11, 2025). At the time of account opening, VERNON stated RENTDUE CAPITAL was a rental property management business. Online research indicates RENTDUE is a purported options-trading fund. According to its Certificate of Organization, RENTDUE CAPITAL, LLC was formed in the state of Utah on April 23, 2024, by Registered Agent Jace Vernon. VERNON listed the address of RENTDUE CAPITAL, LLC as ████████████████ (RentDue Office).

15. According to MACU, Between April 1, 2025, and July 16, 2025, all of these accounts received 145 deposits from 95 different entities totaling $21,517,174. Many of the funds were sent with "investment" as the purpose of payment. The majority of the funds were deposited via 138 wire transactions from 89 senders into the RENTDUE CAPITAL account (███████ These funds were then transferred to the FORGED OAK LLC account (███████ From the FORGED OAK account, additional wire transfers occurred totaling $17,675,000. Of these wires, 16 were sent to Charles Schwab totaling $15,175,000 and two were sent to the brokerage firm INTERACTIVE BROKERS LLC totaling $2,500,000.

16. On July 23, 2025, The Charles Schwab Corporation (hereinafter referred to as Schwab) reported concerns regarding Schwab account ██████ FORGED OAK LLC (opened July 19, 2023), with TALEASE as Authorized Agent. According to Schwab, SHANE is not listed as an Authorized Agent on the account, but per communications with Schwab, it appeared he was doing the trading in the account. According to Schwab, the FORGED OAK account (██████ received 33 wire deposits between December 12, 2024 and June 10, 2025 from the MACU FORGED OAK LLC account (██████ totaling $27,375,000. Funds were primarily used to trade various

options, with trading during this period resulting in realized losses of approximately $26,570,620. Between April 30, 2025, and June 9, 2025, Schwab representatives had three conversations with SHANE about trading losses in the Forged Oak account. SHANE said he was confident in his options trading strategy. He claimed his account was funded by the sale of his company Legend Solar and money from his real estate development and investment company 720 Empire. He said he was not concerned about the significant losses, and he planned to continue his options trading strategy.

17. On October 12, 2025, Interactive Brokers (hereinafter referred to as IBKR) reported concerns regarding IBKR account ████████ in the name of FORGED OAK, LLC. The FORGED OAK account (███████ opened at IBKR on July 8, 2025. FORGED OAK informed IBKR during the account opening process that it was an operating business and was not soliciting or accepting investors, and that its source of wealth was business revenue, property, and trading profits. According to IBKR, FORGED OAK, LLC is the management entity for RENTDUE CAPITAL, LLC. Previously, RENTDUE's website mentioned that capital was traded through a Schwab brokerage account held by the fund's management company FORGED OAK, LLC. Additional details regarding the MACU, SCHWAB, and IBKR accounts will be provided in the probable cause section of this affidavit.

18. On October 2, 2025, ████████████████ attended an investment seminar in St. George, Utah, hosted by VERNON. The event was advertised on the RENTDUE website rentduecapital.com and on Instagram. During the seminar, VERNON discussed various investment strategies, including RENTDUE Funds 1, 2, and 3. VERNON told participants the minimum initial investment in any of the RENTDUE funds was $100,000, due to SEC regulations allowing only "accredited investors." VERNON described RENTDUE Funds 1 and 2 as options

trading funds with compounding returns. VERNON said investors receive 70% of the profits and RENTDUE receives 30%. VERNON described RENTDUE Fund 3 as a safer, cash flow option, with 1.5% per month preferred returns paid directly to investor bank accounts. Speaking of his partner SHANE, VERNON said, "I don't trade anymore. That's SHANE. He's in his house. That's all he does." VERNON said he does not disclose SHANE's last name. He said SHANE was "here in St. George."

19. On October 7, 2025, ██ ████ participated in the RENTDUE CAPITAL Q3 2025 Investor Call over Zoom. VERNON was the host of the call. During the call, VERNON's Zoom username was displayed as "Jace Vernon." Throughout the call, VERNON shared the screen of what appeared to be, based on icons visible at various times, his Apple computer. He showed several account statements and other RENTDUE information, and one personal picture, which he claimed to be of himself dunking a basketball on former professional basketball player Shaquile O'Neal. VERNON was asked how to contact him directly. He answered that anyone can visit him at the office or have a phone call or Zoom call. In response to a question asking if there were multiple people trading for RENTDUE, VERNON answered that there were not. He said, "in the best funds out there it usually comes down to one guy pulling the trigger." He also said, "if something happens to me or something happens to SHANE, most likely the fund just gets shut down." One call participant entered the question, "How many total investors are there right now?" ANGIE replied in the chat, "Around 200." As previously noted, of the over $21 million deposited into the MACU accounts between April 1, 2025 and July 16, 2025, the majority of the funds were deposited via 138 wire transactions from 89 senders into the RENTDUE CAPITAL account (██████ Some of those wires came from the state of Utah, while the majority came from other states across the country.

20.   During the Zoom call, VERNON displayed several IBKR account statements. According to VERNON, these statements showed the balance and performance of the Interactive Brokers account containing all investments in RENTDUE Funds 1, 2, and 3, titled FORGED-RENTDUE with the account number redacted except the last digit, 6. Below your affiant will present various screenshots of three different IBKR documents, displayed by VERNON during the Zoom call, along with account information from IBKR.





The statement above shows an account balance on August 31, 2025, of over $102 million, with over $5 million in earnings and over $8 million in deposits in the previous month.





The statement above shows an account balance on September 30, 2025, of over $115 million, with over $5 million in earnings and over $6 million in deposits in the previous month.

21. During the Zoom call, VERNON also displayed the following IBKR Account Confirmation Letter (ACL) showing a FORGED-RENTDUE account Net Liquidation Value of over $119 million as of October 6, 2025. The statement shows an account opening date of July 8, 2024.





22. According to IBKR, the FORGED OAK account ▮▮▮▮▮ was opened on July 8, 2025. RENTDUE initiated an account application at the same time, but that application was never completed. As of October 10, 2025, the FORGED OAK account had a lifetime loss (July 8, 2025 to October 10, 2025) of over $3.2 million, with total deposits of only $9.5 million.

23. As of October 25, 2025, the RENTDUE website, rentduecapital.com, had a video posted on its home screen. The video began with a picture of VERNON and a narrator introducing himself as "Jace." During the video, VERNON displays the following IBKR ACL.







The document shows a redacted account number ending in 66, which aligns with the IBRK FORGED OAK account ███████ The document is dated September 15, 2025, and shows a Net Liquidation Value of over $110 million. As previously noted, according to IBKR, the FORGED OAK account ███████ was opened on July 8, 2025, not 2024. According to IBKR, copies of actual IBKR ACLs accessed by account holders were retrieved from IBKR's system. Each ACL reflected an equity balance of roughly $2.56 million and the correct opening date of July 8, 2025. IBKR noted that account holders did not run any ACL reports on September 15, 2025, and the most recent report was run on July 22, 2025. Additionally, the account balance listed in the document had a different font, was bolded, and was slightly misaligned with the other fields, leading IBRK to believe that the document had been digitally altered. IBRK advised no other accounts existed for VERNON, SHANE, or TALEASE.

24. In the video, VERNON claims he began the RENTDUE fund with his friend SHANE in August 2023 and opened it to investors on May 3, 2024. VERNON displayed a spreadsheet

depicting daily returns for the RENTDUE fund since its inception in 2023. VERNON highlighted RENTDUE fund performance in quarter 3 of 2025, which began July 1 and continued through September 12. VERNON claimed the RENTDUE fund was fully liquid and had over $88 million. He also claimed the last losing day for the fund was May 6, 2025. According to IBKR, these claims did not match the actual account history. The FORGED OAK account had 10 losing days ($353,766.20 average loss per losing day) and only eight winning days ($105,705.10 average win per winning day) between July 9 and August 1, 2025.

25.  The following section will highlight examples of investor money as it first arrived in the MACU RENTDUE account ██████████ and was then transferred to the MACU FORGED OAK account ██████████ From the MACU FORGED OAK account ██████████ some investor funds were sent to the SCHWAB FORGED OAK ██████████ and the IBKR FORGED OAK ██████████ investment accounts as would be expected. As previously noted, both investment accounts suffered significant losses over their lifespans. Millions of dollars of investor money were also diverted from the MACU FORGED OAK account ██████████ to various bank accounts, which do not appear to be related to RENTDUE investments. Specifically, over $16 million was sent to a MACU account titled 720 EMPIRE LLC, which appears to be used, substantially, for personal expenses for SHANE and his family.

26. According to MACU records, investor money that came into the MACU RENTDUE account ██████████ was typically transferred to the MACU FORGED OAK account ██████████ within a few days. Of note, according to MACU records, from its opening on July 31, 2023, the MACU FORGED OAK account ██████████ never returned any money to the MACU RENTDUE account ██████████ On May 5, 2025, the MACU RENTDUE account ██████████ received a wire transfer of $100,000 from Wells Fargo account number ██████████ with text: '██████████

Option Trade." Before the deposit, the account had a balance of $692.20. After the ███████ $100,000 deposit, the account received five additional deposits between May 6, 2025, and May 8, 2025, bringing the account balance to $837,726.69 on May 8, 2025. That same day, after the last deposit, there was a withdrawal transfer to the MACU FORGED OAK account ████████ in the amount of $837,000, bringing the account balance of the MACU RENTDUE account ████████ to $726.69. On June 20, 2025, the MACU RENTDUE account ████████ had a balance of $890.14, with virtually all investor money having been sent to the MACU FORGED OAK account ████████ or disbursed to previous investors, via various transfers over the previous month. Between June 20, 2025 and June 30, 2025, the MACU RENTDUE account ████████ received 12 deposits by wire transfer, all of which appeared to come from individual investors. The total amount deposited was $1.68 million. On June 30, 2025, the MACU RENTDUE account ████████ sent a wire transfer to ████████, Wells Fargo account number ████████ in the amount of $104,036.08, with text "RENT DUE – ACCT CLOSE." A review of rentduecapital.com/numbers on October 25, 2025, showed the following chart titled "RENTDUE Track Record (Public Access): RENTDUE DAILY TRACK RECORD".

| RENTDUE Track Record (Public Access) | RENTDUE DAILY TRACK RECORD | | | |
|---|---|---|---|---|
| Date | Balance | Daily Return | % Return | Profits |
| RENTDUE Daily Track Record | | | | |
| Aug 1, 23 | $202,652.92 | $2,652.92 | 1.31% | $2,652.92 |

| RENTDUE Track Record (Public Access) : RENTDUE DAILY TRACK RECORD | | | | |
|---|---|---|---|---|
| May 5, 25 | $50,591,574.00 | $116,627.00 | 0.23% | $12,922,566.00 |
| May 6, 25 | $50,554,106.00 | -$37,467.00 | -0.07% | $12,885,099.00 |
| May 7, 25 | $50,645,483.00 | $91,377.00 | 0.18% | $12,976,476.00 |
| May 8, 25 | $50,771,486.00 | $126,002.00 | 0.25% | $13,102,478.00 |
| May 9, 25 | $50,872,474.00 | $100,988.00 | 0.20% | $13,203,466.00 |
| May 12, 25 | $51,813,517.00 | $104,043.00 | 0.20% | $13,307,509.00 |
| May 13, 25 | $51,937,020.00 | $123,512.00 | 0.24% | $13,431,022.00 |
| May 14, 25 | $52,507,843.00 | $74,813.00 | 0.14% | $13,505,835.00 |
| May 15, 25 | $52,620,357.00 | $112,514.00 | 0.21% | $13,618,349.00 |
| May 16, 25 | $53,878,828.00 | $118,472.00 | 0.22% | $13,736,821.00 |
| May 19, 25 | $54,453,423.00 | $127,594.00 | 0.23% | $13,864,415.00 |
| May 20, 25 | $54,558,654.00 | $105,231.00 | 0.19% | $13,969,646.00 |
| May 21, 25 | $54,696,506.00 | $137,852.00 | 0.25% | $14,107,498.00 |
| May 22, 25 | $54,793,073.00 | $96,567.00 | 0.18% | $14,204,065.00 |
| May 23, 25 | $54,896,770.00 | $103,697.00 | 0.19% | $14,307,762.00 |
| May 26, 25 | $55,844,770.00 | $0.00 | 0.00% | $14,307,762.00 |
| May 27, 25 | $55,958,855.00 | $114,085.00 | 0.20% | $14,421,847.00 |
| May 28, 25 | $56,082,017.00 | $123,163.00 | 0.22% | $14,545,010.00 |
| May 29, 25 | $56,191,021.00 | $109,004.00 | 0.19% | $14,654,014.00 |
| May 30, 25 | $56,265,360.00 | $74,339.00 | 0.13% | $14,728,353.00 |
| Jun 2, 25 | $56,494,098.00 | $48,738.00 | 0.09% | $14,777,090.00 |
| Jun 3, 25 | $56,643,177.00 | $149,079.00 | 0.26% | $14,926,169.00 |
| Jun 4, 25 | $56,753,231.00 | $110,054.00 | 0.19% | $15,036,223.00 |
| Jun 5, 25 | $56,897,084.00 | $143,853.00 | 0.25% | $15,180,076.00 |
| Jun 6, 25 | $57,000,699.00 | $103,615.00 | 0.18% | $15,283,692.00 |
| Jun 9, 25 | $58,631,057.00 | $86,357.00 | 0.14% | $15,370,049.00 |
| Jun 10, 25 | $59,781,194.00 | $150,137.00 | 0.25% | $15,520,187.00 |
| Jun 11, 25 | $59,885,211.00 | $104,017.00 | 0.17% | $15,624,203.00 |

RENTDUE DAILY TRACK RECORD

Are You Ready To Invest?    Get Our Weekly Updates

| RENTDUE Track Record (Public Access) : RENTDUE DAILY TRACK RECORD | | | | |
|---|---|---|---|---|
| Jun 10, 25 | $59,781,194.00 | $150,137.00 | 0.25% | $15,520,187.00 |
| Jun 11, 25 | $59,885,211.00 | $104,017.00 | 0.17% | $15,624,203.00 |
| Jun 12, 25 | $60,003,803.00 | $118,593.00 | 0.20% | $15,742,796.00 |
| Jun 13, 25 | $60,160,041.00 | $156,238.00 | 0.26% | $15,899,034.00 |
| Jun 16, 25 | $61,090,409.00 | $130,368.00 | 0.21% | $16,029,402.00 |
| Jun 17, 25 | $61,249,653.00 | $159,244.00 | 0.26% | $16,188,646.00 |
| Jun 18, 25 | $61,367,148.00 | $117,494.00 | 0.19% | $16,306,140.00 |
| Jun 19, 25 | $61,367,148.00 | $0.00 | 0.00% | $16,306,140.00 |
| Jun 20, 25 | $61,490,741.00 | $123,593.00 | 0.20% | $16,429,733.00 |
| Jun 23, 25 | $62,628,394.00 | $145,653.00 | 0.23% | $16,575,386.00 |
| Jun 24, 25 | $62,748,134.00 | $119,740.00 | 0.19% | $16,695,127.00 |
| Jun 25, 25 | $62,826,034.00 | $77,900.00 | 0.12% | $16,773,027.00 |
| Jun 26, 25 | $62,987,681.00 | $161,647.00 | 0.26% | $16,934,674.00 |
| Jun 27, 25 | $63,123,637.00 | $135,955.00 | 0.22% | $17,070,629.00 |
| Jun 30, 25 | $64,623,718.00 | $110,381.00 | 0.17% | $17,181,010.00 |
| Jul 1, 25 | $64,744,970.00 | $121,252.00 | 0.19% | $17,302,262.00 |
| Jul 2, 25 | $64,914,787.00 | $169,818.00 | 0.26% | $17,472,080.00 |
| Jul 3, 25 | $65,057,161.00 | $142,373.00 | 0.22% | $17,614,453.00 |
| Jul 4, 25 | $65,057,161.00 | $0.00 | 0.00% | $17,614,453.00 |
| Jul 7, 25 | $65,319,954.00 | $148,793.00 | 0.23% | $17,763,247.00 |
| Jul 8, 25 | $65,429,683.00 | $109,729.00 | 0.17% | $17,872,975.00 |
| Jul 9, 25 | $65,593,687.00 | $164,004.00 | 0.25% | $18,036,980.00 |
| Jul 10, 25 | $65,763,205.00 | $169,518.00 | 0.26% | $18,206,498.00 |
| Jul 11, 25 | $65,909,059.00 | $145,854.00 | 0.22% | $18,352,352.00 |
| Jul 14, 25 | $67,506,844.00 | $108,785.00 | 0.16% | $18,461,136.00 |
| Jul 15, 25 | $67,592,295.00 | $85,451.00 | 0.13% | $18,546,587.00 |
| Jul 16, 25 | $67,736,320.00 | $144,026.00 | 0.21% | $18,690,613.00 |
| Jul 17, 25 | $67,899,505.00 | $163,184.00 | 0.24% | $18,853,797.00 |

RENTDUE DAILY TRACK RECORD

Are You Ready To Invest?    Get Our Weekly Updates

The chart on the website gives daily return percentages claimed by RENTDUE for the life of the RENTDUE fund. Only the time period of May 5 through July 17, 2025, is displayed in the screenshots above to show purported returns during the time ███ was invested with RENTDUE. Based on the daily gains noted on the chart between May 5 and June 23 (VERNON told investors in the October 7 Zoom call, that it takes approximately five days to get your money back after requesting a withdrawal), the $100,000 invested by ███████ on May 5 would have earned approximately $6,000 by June 23. After taking the 30% share of earnings that RENTDUE advertises, the total payout on June 30 would be approximately $104,000. As noted above, the only money in the MACU RENTDUE account ██████ on June 30 arrived in the account from other investors over the previous 10 days. This example shows VERNON paying an investor, ████ ████ who was closing his account, with new investor money because █████ initial $100,000 investment was already lost. According to SCHWAB, the actual RENTDUE investment account at that time, SCHWAB FORGED OAK account ██████ suffered total losses of over $4 million in May 2025 and over $4.6 million in June 2025. This type of return payment of later investors' money being used to pay for early investors' withdrawals is typical of Ponzi schemes and shows concealing behavior consistent with money laundering techniques to continue to perpetrate the investment scheme.

27. During the month of July 2024, the MACU FORGED OAK account ██████ began the month with a balance of $1,612.09. Throughout the month, the account received a total of $600,000 in deposits broken down as follows: two deposits by wire transfer from the SCHWAB FORGED OAK account ██████ totaling $300,000, and three deposits by transfer, of money appearing to be from RENTDUE investors, from the MACU RENTDUE account ██████ totaling $300,000. During the same month, the following withdrawals took place: four cashier's

checks and one transfer to 720 EMPIRE LLC totaling $150,000, and one transfer to DJD ENTERPRISES for $355,000. The account ended the month of July with a balance of $96,404.23. No money was sent to the SCHWAB FORGED OAK account ███████ during July. As previously discussed, TALEASE is the registered agent of 720 EMPIRE, LLC. ████  ██████ is the incorporator of DJD ENTERPRISES CORP. ██████ has been associated with SHANE on previous businesses. In 2008, SHANE and ██████ were both listed as members of FREEDOM REVOLUTION, LLC on its Utah Articles of Organization. SHANE and ██████ were both also listed as directors, along with two others, in the 2007 Utah Articles of Incorporation for THE QUANTUM PRODIGY INC.

28. Upon learning of potentially criminal activity involving the RENTDUE investment funds, an individual with specific knowledge of RENTDUE and its business practices provided information to investigators. For purposes of this affidavit, the cooperating individual will be referred to as Person-1. ███████████████████████████

███████████████████████████████████████████████

███ ████ ████ ██ █ █ █ ████ ███ ████ ████ ████ ██ ████ ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

29. According to Person-1, ███████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████. Previously, investors sent money to RENTDUE through the MACU accounts. Now, they send investment money to the ZIONS accounts. From the ZIONS accounts, VERNON sends money to an account named FORGED OAK LLC, ending in ████ Person-1 said RENTDUE receives, on average, $1 - $2 million per week, which it sends to FORGED OAK. VERNON sent approximately $4.2 million to FORGED OAK the week of October 17, 2025.

30. Vernon Residence: VERNON's Utah Driver License lists ████████████████ Washington, UT 84780 (VERNON RESIDENCE), as his address. On October 29, 2025, VERNON was observed at his residence. VERNON entered a black Cadillac Escalade, bearing temporary Utah registration, and drove to the Kiln office building where the RENTDUE office is located. VERNON was seen entering the office building.

31. Perkins Residence: Both SHANE and TALEASE list ████████████████ 84780 (PERKINS RESIDENCE) as their address on their Utah Driver License. On October 27 and 28, 2025, a flatbed trailer bearing Utah registration ██████, was parked in front of the residence. The registered owner of the trailer is SHANE PERKINS. As previously described, VERNON told participants in the October 2 investment seminar that SHANE was the only trader for RENTDUE. Regarding SHANE's investing, VERNON said, "I don't trade anymore. That's SHANE. He's in his house. That's all he does." He said SHANE was "here in St. George."

32. RENTDUE Office: As previously stated, according to Person-1, VERNON claims he works at the RENTDUE office, located in the Kiln office building, every day. Additionally, on October 28, 2025, your affiant went to the office address listed on rentduecapital.com, 1161 S.

2450 E., B2, St. George, UT. The office was occupied by ERTH spa, which lists VERNON as a co-founder on its website. An employee of ERTH spa advised that VERNON used to have a RENTDUE office co-located with the spa, but that he moved to the Kiln. Your affiant visited the Kiln and located an office in the southwest corner of the first floor with a RENTDUE sign on the door. The office will be described in more detail in Attachment B.

## CONCLUSION

33. Based on the facts set out in this affidavit, your affiant believes probable cause exists that Matthew SHANE Perkins and Jeffrey Jace VERNON are responsible for causing and facilitating the alleged violations, including 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1348 (securities fraud); and 18 U.S.C. § 1957 (money laundering) by the means of their cell phones, computers, Google accounts, and home and business addresses (**TARGET PREMISES**), and that evidence of those violations will be found at VERNON's and PERKINS's homes and office, as well as in the RentDue google drive and VERNON's email account.

## COMPUTERS ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

34. As described above and in Attachment B, this application seeks permission to search for records that might be found at the **TARGET PREMISES** in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure.

35. I submit that if a computer or storage medium is found at the **TARGET PREMISES** there is probable cause to believe the records described in Attachment B will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

23

    d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache".

36. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the **TARGET PREMISES** because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.   Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish

that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

37. In most cases, a thorough search of the **TARGET PREMISES** for information that might be stored on storage media often requires agents to seize physical storage media and later review the media consistent with the warrant. In lieu of removing storage media from the **TARGET PREMISES**, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on the **TARGET PREMISES** could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt

on-site.

    b.  Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the **TARGET PREMISES**. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off- site reviewing with specialized forensic tools.

38. Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, when officers executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit officers either to seize or to image-copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and then later examine the seized storage media or image copies consistent with the warrant. The examination may require searching authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection to determine whether it is evidence described by the warrant.

39. Based on the foregoing, I assert that probable cause exists to issue a search warrant for the

**TARGET PREMISES** described in Attachment A. Based on my training and experience, I believe that the **TARGET PREMISES** possesses evidence that will show that **SHANE** and **VERNON** are involved with the aforementioned crimes including wire fraud, securities fraud, and money laundering.

## BACKGROUND CONCERNING GOOGLE[1]

40. Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze. Many of these free services offer additional functionality if the user signs into their Google Account.

41. In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

42. Signing up for a Google Account automatically generates an email address at the domain gmail.com. That email address will be the log-in username for access to the Google Account.

---

[1] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

43. Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

44. Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

45. When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

46. Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the

Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

47. Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

48. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

49. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

50. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

51. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

52. Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

53. Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## EXECUTION OF GOOGLE WARRANT

54. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B-2. Upon receipt of the information described in Section I of Attachment B-2, government-authorized persons will review that information to locate the items described in Section II of Attachment B-2.

55. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of the warrant on Google.

56. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

FBI Special Agent Kenneth Smith

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, on this **31** day of October, 2025.

Paul Kohler
United States Magistrate Judge

33

**ATTACHMENT A-1**

PROPERTY TO BE SEARCHED

**Vernon Residence,** located at ███████████████████ (pictured below), is described as a single-family residence with a gray tile roof, gray and light tan stucco exterior, entryway composed of rock-covered pillars on either side of a dark colored door with four glass panels, and the numbers ████ arranged horizontally on the front of the house, to the left of the entryway.



**ATTACHMENT A-2**

PROPERTY TO BE SEARCHED

**Perkins Residence,** located at ███████████████████ (pictured below), is described as a single-family residence with a tan tile roof, tan stucco and rock exterior, and dark brown garage door with a light-colored plaque bearing the numbers ████ on the left side of the garage door. It has a courtyard enclosed by a low wall, a stonework arched entryway, and a brown wooden door.



**ATTACHMENT A-3**

PROPERTY TO BE SEARCHED

**RentDue Office,** located at ████████████████████ (pictured below), is described as a two-story office building with "kiln." displayed in large metallic letters near roof over the front door, and the numbers "1575" above the front door. The main lobby is directly inside the front door. The RENTDUE office is in the Southwest corner of the building, down the hall to the right, immediately past the front desk in the lobby. The office has glass walls and a RENTDUE sign on the door. A small, black wall is visible in the office with a neon sign reading RENTDUE, similar in appearance to the backdrop behind VERNON in the October 7, 2025, Zoom call.



**ATTACHMENT A-4**

**Person to Be Searched**

The person of Matthew SHANE Perkins, date of birth 01/28/1979, social security number ending in ██████, 6"04" tall, 200 pounds (height and weight according to Utah Driver License) and includes and includes any computers, computer equipment, smartphones and/or any other electronic media on SHANE's person and in the area within SHANE's immediate reach, including any personal effects located therein. SHANE is depicted in the following photograph:



37

**ATTACHMENT A-5**

**Person to Be Searched**

The person of Jeffrey Jace VERNON, date of birth 06/03/1980, social security number ending in ████, 6'01" tall, 175 pounds (height and weight according to Utah Driver License) and includes and includes any computers, computer equipment, smartphones and/or any other electronic media on VERNON's person and in the area within VERNON's immediate reach, including any personal effects located therein. VERNON is depicted in the following photograph:



**ATTACHMENT A-6**

**(GOOGLE)**

**Property to be Searched**

Business address:    Google LLC

1600 Amphitheatre Parkway

Mountain View, California 94043

This warrant applies to information associated with the following email accounts and Google Drive (collectively, the "ACCOUNTS"):

████████████████████

████████████████████

that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**ATTACHMENT B-1**

DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED FROM (1) VERNON
RESIDENCE, (2) PERKINS RESIDENCE, (3) RENTDUE OFFICE, (4) PERKINS'S PERSON,
AND (5) VERNON'S PERSON

The following items, records, and information are to be seized wherever they may be stored or
found on the properties and in any form that they may be stored or found on the properties that
constitute evidence and/or instrumentalities of potential criminal offenses including, (a) 18 U.S.C.
§ 1343 (wire fraud); (b) 18 U.S.C. § 1348 (securities fraud); and (c) 18 U.S.C. § 1957 (money
laundering):

This evidence, fruits, and instrumentalities includes:

- All records of Personally Identifiable Information (PII) related to SHANE, TALEASE,
VERNON, or any investors in Forged Oak or RentDue.

- Information relating to RentDue Capital, LLC, Forged Oak, LLC, 720 Empire, LLC, and 

- Information relating to the participation by any individuals in the Forged Oak or RentDue
investment scheme, including Matthew SHANE Perkins, Jeffrey Jace VERNON, TALEASE
Perkins, and any other partners, affiliates, employees, or associates of **SHANE or VERNON**.

- Client or employment agreements, client files, contracts, operations, expenses, receivables, or
other financial information, including notes, ledgers, accounting records, accounts payable
records, accounts receivable records, paid or pending bills, disbursement records, invoices,
receipts, correspondence, financial statements and bank statements, wire transfer records, deposit
slips, deposit items, canceled checks, money drafts, money orders, cashier's checks, letters of
credit, and records of loans and/or lending activities.

- Records of investments and holdings, real estate ownership and accounts, deeds and titles,
appraisals, records of transaction details, mining claims, title and escrow documents,
correspondence, and travel related documents.

- Identifying and contact information for all vendors, contractors, and/or clients.

- Documents, records, correspondence, and memoranda in any form relating to the business
activities of **SHANE or VERNON**, and any other partners, affiliates, employees, or associates.

- Personal and business tax returns (federal, state and local) and all records relied upon
and/or utilized in their preparation which includes IRS Forms 1040, 1041, 1120, 1065, 940,
941, W-2, 1099, 8283, work papers, depreciation schedules, summary journals and
statements used to prepare these returns.

- All corporate and trust records and filings including, but not limited to, articles of
incorporation, agreements, bylaws and amendments, shares, stock ledgers, shareholder lists and
minute books for any and all entities.

- Information and communications with and about the FTC, the IRS, and any other law enforcement agency.

### COMPUTER RECORDS

For any computer or storage medium that contains, or in which is stored records or information that is otherwise called for in this warrant, including all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, disks, removable storage drives, and network hardware.

    a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.    evidence of the lack of such malicious software;

    d.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e.    evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

    f.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    h.    evidence of the times the COMPUTER was used;

    i.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    j.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.    records of or information about Internet Protocol addresses used by the COMPUTER;

l.    records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.    contextual information necessary to understand the evidence described in this attachment.

Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

**ATTACHMENT B-2**

DESCRIPTION OF ITEMS TO BE SEARCHED FOR AND SEIZED FROM GOOGLE

**I.        Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A-6 is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), on or about October 30, 2025 with Google Reference Number 113449216, Google is required to disclose to the government for each account or identifier listed in Attachment A-6 the following information from July 11, 2023, through the present, unless otherwise indicated:

1. The contents of any communication or file stored by or for the ACCOUNTS and any associated accounts, and any information associated with those communications or files, such as the source and destination email addresses or IP addresses.

2. All records and other information relating to the ACCOUNTS and any associated accounts including the following:

    a.   Names (including subscriber names, user names, and screen names);

    b.   Addresses (including mailing addresses, residential addresses, business addresses, and email addresses);

    c.   Local and long-distance telephone connection records;

    d.   Records of session times and durations;

    e.   Length of service (including start date) and types of service utilized;

    f.   Telephone or instrument numbers (including MAC addresses);

    g.   Other subscriber numbers or identities (including temporarily assigned network

43

addresses, registration Internet Protocol ("IP") addresses, and records showing

IP addresses used to access the EMAIL ACCOUNTS); and

h.    Means and source of payment for such service (including any credit card or

bank account number) and billing records.

3.    All location history information.

4.    All available activity, connection and transactional logs, including user agent strings.

5.    All Google Drives, Calendars, and Contacts associated with the ACCOUNTS.

6.    All archived Google Chat communications associated with the ACCOUNTS.

7.    Records of user activity for each connection made to or from the ACCOUNTS, including, for all Google services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Google service, and all activity logs.

Google is hereby ordered to disclose the above information to the government within 10 days of issuance of this warrant.

## II. Information to be seized by the government.

All information described above in Section I that constitutes constitute evidence and/or instrumentalities of potential criminal offenses including, (a) 18 U.S.C. § 1343 (wire fraud); (b) 18 U.S.C. § 1348 (securities fraud); and (c) 18 U.S.C. § 1957 (money laundering):

This evidence, fruits, and instrumentalities includes:

- All records of Personally Identifiable Information (PII) related to SHANE, TALEASE, VERNON, or any investors in Forged Oak or RentDue.

- Information relating to RentDue Capital, LLC, Forged Oak, LLC, 720 Empire, LLC, and ███

- Information relating to the participation by any individuals in the Forged Oak or RentDue investment scheme, including Matthew SHANE Perkins, Jeffrey Jace VERNON, TALEASE Perkins, and any other partners, affiliates, employees, or associates of **SHANE or VERNON**.

44

- Client or employment agreements, client files, contracts, operations, expenses, receivables, or other financial information, including notes, ledgers, accounting records, accounts payable records, accounts receivable records, paid or pending bills, disbursement records, invoices, receipts, correspondence, financial statements and bank statements, wire transfer records, deposit slips, deposit items, canceled checks, money drafts, money orders, cashier's checks, letters of credit, and records of loans and/or lending activities.

- Records of investments and holdings, real estate ownership and accounts, deeds and titles, appraisals, records of transaction details, mining claims, title and escrow documents, correspondence, and travel related documents.

- Identifying and contact information for all vendors, contractors, and/or clients.

- Documents, records, correspondence, and memoranda in any form relating to the business activities of **SHANE or VERNON**, and any other partners, affiliates, employees, or associates.

- Personal and business tax returns (federal, state and local) and all records relied upon and/or utilized in their preparation which includes IRS Forms 1040, 1041, 1120, 1065, 940, 941, W-2, 1099, 8283, work papers, depreciation schedules, summary journals and statements used to prepare these returns.

- All corporate and trust records and filings including, but not limited to, articles of incorporation, agreements, bylaws and amendments, shares, stock ledgers, shareholder lists and minute books for any and all entities.

- Information and communications with and about the FTC, the IRS, and any other law enforcement agency.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Google LLC ("Google"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Google. The attached records consist of _____. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google, and they were made by Google as a regular practice; and

b.      such records were generated by Google's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Google, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____

Date                                        Signature